**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


TRAVION GERMAN,

          Plaintiff,                         Civil Case Number: 08-10834

v.                                     PAUL D. BORMAN
                                     UNITED STATES DISTRICT COURT

DARRIN McCALLISTER and DOUGLAS
McQUARRIE,

          Defendants.
_____/


**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Now before the Court is defendants Darrin McAllister's and Douglas McQuarrie's March

2, 2009 Motion for Summary Judgment. (Dkt. No. 20). Plaintiff Travion German ("Plaintiff") filed

his Response on April 6, 2009. (Dkt. No. 24). The Court held a hearing on the matter on August 12,

2009. For the following reasons, the Court DENIES IN PART and GRANTS IN PART

Defendants' Motion for Summary Judgment.

**I.       BACKGROUND**

This 42 U.S.C. § 1983 action arises from an alleged unlawful arrest that thereafter resulted

in excessive force by defendants Darrin McAllister ("Detective McAllister") and Douglas

McQuarrie ("Detective McQuarrie") (collectively, "Defendants")—detectives for the City of

Pontiac, Michigan, Police Department. The incidents in question took place on October 5, 2006.

A.      **Plaintiff's Version of the Events**

On October 5, 2006, during the afternoon hours, Plaintiff was at his father Edward German's house at 97 Roselawn, Pontiac, Michigan, working on automobiles with his father in the garage. (Pl.'s Resp. Br. Ex. A, Pl.'s Dep. 17).  Around this time, Plaintiff had been splitting time living with his mother in Grand Blanc, Michigan and his father in Pontiac, but for the six months leading up to the incident, Plaintiff had been living at his father's house.  (Pl.'s Dep. 62; Pl.'s Resp. Br. Ex. B, Edward German Dep. 31-32).

According to Plaintiff and his father, at approximately some time between 5:00 and 6:00 p.m., Defendants pulled their unmarked blue Chevy Impala police vehicle up to two individuals standing at the corner of Michigan and Roselawn, near Edward German's house.  (Pl.'s Dep. 63-64, 75-77).  Plaintiff knew the individuals as Dray and Kwamay; both men were neighbors of his father. (Pl.'s Dep. 64-65).   Plaintiff testified that he had seen the individuals standing at the corner for at least over thirty minutes before the Defendants pulled up to them.   (Pl.'s Dep. 72-73).   Although Plaintiff knew the individuals, he testified that he had no contact whatsoever with them nor did he leave his father's garage area around the time that the Defendants pulled up to the corner outside his father's house. (Pl.'s Dep. 67, 74-75).

When the Defendants exited their vehicle, Detective McQuarrie approached the individuals at the corner, and Detective McAllister began walking toward Plaintiff and asked him two or three times to "come here." (Pl.'s Dep. 77-78; E. German Dep. 52).   At this point, Plaintiff turned to his father and asked him what he should do.  (Pl.'s Dep. 79).   Edward German then tried to intervene by telling Detective McAllister that he is Plaintiff's father, that Plaintiff is just sixteen years old, and

that Plaintiff has been right there with him the whole time. (E. German Dep. 52:12-14). Detective McAllister ignored Edward German's pleas, allegedly grabbed Plaintiff by the arm, and twisted it behind his back. (Pl.'s Dep. 79; E. German Dep. 52). Plaintiff alleges that he did not know that Detective McAllister was a police officer until after Detective McAllister grabbed Plaintiff's arm and put it behind his back. (Pl.'s Dep. 86).

Detective McAllister then brought Plaintiff to the police vehicle; Plaintiff continued asking Detective McAllister, "what did I do?" (Pl.'s Dep. 87). Plaintiff also yelled at Detective McAllister to let him go and to "loosen up." (Pl.'s Dep. 89). Plaintiff's father told Plaintiff to calm down because he did not want "his son to get beat up anymore." (E. German Dep. 55-56).

When they arrived at the police vehicle, Detective McAllister pushed Plaintiff onto the vehicle's hood so that his back landed on the hood of the vehicle. (Pl.'s Dep. 92; E. German Dep. 54). Detective German then flipped Plaintiff over and, according to Plaintiff's father, allegedly slammed his face into the hood with his elbow on Plaintiff's neck and his hand on the top of Plaintiff's head. (E. German Dep. 54, 59-64). From this position, Plaintiff saw Detective McQuarrie search the two individuals who were standing on the corner. Detective McQuarrie found marijuana on Dray and made Dray stomp out the weed on the ground. Detective McQuarrie then released Dray and Kwamay.

No drugs were found on Plaintiff.

Detective McAllister then placed Plaintiff into the back of the police car and drove away from Edward German's home, but then stopped the vehicle approximately one block later. (Pl.'s Dep. 104-105). Detective McAllister turned to Plaintiff, said "your dad's not here to protect you now," and punched him in the face approximately four to five times under his right eye. (Pl.'s Dep.

3

102, 105-06).  Plaintiff testified that the attack happened quickly and that all of the punches occurred consecutively, right after each other.  (Pl.'s Dep. 106-111).  During the attack, Plaintiff allegedly asked Detective McQuarrie to stop the punching and grab Detective McAllister's hands.  (Pl.'s Dep. 108-109).   Because Plaintiff was still in handcuffs, he could not avoid Detective's McAllister's punches, but he did turn his head away from the attack.  (Pl.'s Dep. 111-112).

After a brief stop at a convenience store where Detective McQuarrie purchased a sports drink, Defendants took Plaintiff to the City of Pontiac police station, where he was booked and eventually released.

### B.      Defendants' Version of the Events

On October 5, 2006, Defendants were patrolling an area of the city that they believed prevalent for criminal activity and drug trafficking when Detective McQuarrie observed a hand-to-hand drug sale between Plaintiff and two individuals near the intersection of Michigan and Roselawn.  (McAllister Dep. 12).   The Defendants turned around their vehicle and returned to the intersection to investigate.   As Defendants exited their vehicle, they observed all three individuals heading in separate directions—Plaintiff toward his father's house and the other two individuals in another direction.

Detective McAllister followed Plaintiff as he walked from the street to his father's garage area. (McAllister Dep. 27).  Detective McAllister announced that he was a police Detective and that he wanted Plaintiff to return to his police vehicle because they were in the process of conducting an investigation.  (McAllister Dep. 26-27).   Detective McAllister finally caught up with Plaintiff near the garage area and apprehended him by putting him in an arm lock.  (McAllister Dep. 26-27).   As Detective McAllister brought Plaintiff to the police vehicle, Plaintiff continued to curse loudly and

escalated his level of resistance. (McAllister Dep. 30-31, 33-34). At one point, Plaintiff's father

allegedly told Plaintiff to "stop being crazy" or "stop acting crazy." (McAllister Dep. 30, 34).

As Detective McAllister approached the vehicle with Plaintiff, he was having a difficult time

subduing Plaintiff, because Plaintiff was stronger, so he used his forearm to push Plaintiff onto the

hood of the vehicle to knock him off balance. (McAllister Dep. 35-36). As a result, Plaintiff's head

and chest made contact with the hood. (McAllister Dep. 37-38). Detective McQuarrie, who had

followed the other two individuals involved in the drug transaction, noticed the struggle and left the

other two individuals to assist Detective McAllister in handcuffing Plaintiff. (McAllister Dep. 35-

36).

Defendants then drove Plaintiff directly to the police station without making any stops. They

asked him some general questions during the trip but were unable to get any answers; Plaintiff was

belligerent, yelling and cursing at Defendants. (McAllister Dep. 41-42). In fact, Defendants

testified that he was so belligerent and combative that he was not able to be fingerprinted or

photographed at the police station and was simply placed in a holding cell once they arrived.

McAllister Dep. 42-43).

After between roughly 90 minutes and two hours had passed, Defendants noticed that

Plaintiff had some swelling to his face. (McAllister Dep. 44). Defendants contacted the paramedics

to examine Plaintiff. (McAllister Dep. 45). At some point thereafter, Defendants released Plaintiff

from custody.

## C.    Plaintiff's Undisputed Medical Treatment and Injuries

After Plaintiff was released from custody, Plaintiff's mother drove Plaintiff to St. Joseph

Mercy - Oakland hospital in Pontiac, Michigan. He presented to the emergency department with

a history that "he was assaulted by the police Detective, head on roof of car.  Stated Detective turned

around in car and punched in face."  (Pl.'s Resp. Br. Ex. E, St. Joseph Mercy Medical Records).

The medical records indicate that Plaintiff had soft tissue swelling near his right cheek bone and a

possible right sphenoid buckle fracture.  (*Id.*)  Plaintiff took photographs of the affected area while

he was in the hospital and again at home.  (Pl.'s Resp Br. Ex. F).   Those photographs show a large

area of swelling on Plaintiff's face near his right cheekbone.  (*Id.*)

## II.    ANALYSIS

### A.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim,

or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a

summary judgment in the party's favor as to all or any part thereof."   Fed. R. Civ. P. 56(b).

Summary judgment is appropriate where the moving party demonstrates that there is no genuine

issue of material fact as to the existence of an essential element of the nonmoving party's case on

which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the
> district court of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any," which it believes demonstrate the absence of a genuine
> issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

(*quoting* Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## B.    Section 1983 and Qualified Immunity

Plaintiff brings his cause of action against under 42 U.S.C. § 1983.  Section 1983 allows plaintiffs to recover damages for injuries caused by persons acting under color of state law for violations of the U.S. Constitution or federal laws.  "A law enforcement officer's key defense to a § 1983 action is encapsulated in the concept of qualified immunity." *Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. 2009). "The doctrine of qualified immunity protects government officials from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129

S. Ct. 808, 815 (2009) (citation and internal quotation marks omitted).

> When[, as here,] the defendant raises qualified immunity, the plaintiff bears the
> burden of proving that the defendant is not entitled to summary judgment. Despite
> this burden of proof, the facts are still viewed in the light most favorable to the
> plaintiff, who is the non-movant. If there are genuine issues of material fact, [a court]
> must view them most favorably to the plaintiffs.

*Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008) (internal citations omitted).

Courts employ a two pronged, non-sequential inquiry as to whether a particular defendant

is entitled to qualified immunity.  *Pearson*, 129 S. Ct. at 818.   Under one prong, the Court

determines whether a constitutional right has been violated on the facts alleged.  *Id*. at 815-16.

Under the other prong, the Court determines whether the alleged constitutional right was "clearly

established" at the time of the defendant's alleged misconduct.  *Id*. at 816.  If either a constitutional

right has not been violated or if that right was not "clearly established," then the defendant is entitled

to qualified immunity.  *See id*. at 818.  If, however, either of these first two prongs are satisfied, the

Sixth Circuit "'occasionally' has gone on to determine 'whether the plaintiff offered sufficient

evidence to indicate that what the official allegedly did was objectively unreasonable in light of the

clearly established constitutional rights.'" *Moldowan v. City of Warren*, 570 F.3d 698 (6thh Cir.

2009) (*citing Drogosch*, 557 F.3d at 378).

### 1.     False Arrest and False Imprisonment

Plaintiff's Complaint and Response to Defendant's Motion for Summary Judgment are

dominated by his excessive force claim.   In addition to that claim, however, Plaintiff also asserts

that his Fourth and Fourteenth Amendment rights were violated through Defendants' unreasonable

search and seizure of his person.  (Compl. ¶¶ 19, 25).   Specifically, Plaintiff argues that since he

was not involved in a drug transaction and was merely standing in his father's driveway, his arrest was unlawful.   In addressing Plaintiff's false arrest and false imprisonment claim, the Court first determines whether Defendants had reasonable suspicion to initially detain Plaintiff and then if so, whether Defendants had probable cause to arrest Plaintiff.

 The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266 (2002) (*citing Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In such cases, the Fourth Amendment is satisfied if "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id*. (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "While 'reasonable suspicion' is less a demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

 Courts must look to the "totality of the circumstances" when making reasonable suspicion determinations to see whether the officer  has a "'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id*.   However, mere reliance on an officer's "hunch" is insufficient.  *Id*. at 274.

 "Probable cause," on the other hand, exists when the "facts and circumstances within the Detective's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (citations omitted).

Here, Detective McAllister testified that Detective McQuarrie alerted him to a hand-to-hand drug transaction occurring at the intersection of Michigan and Roselawn as they drove past that intersection.   After turning their police vehicle around, Detective McAllister allegedly saw three males on the corner start to disperse in opposite directions.  Detective McAllister identified Plaintiff as the suspect that he ended up following from location of the alleged hand-to-hand drug sale to the garage area.

Plaintiff and his father testified that they were both standing in the garage area when the Defendants pulled their unmarked police vehicle up to the intersection of Michigan and Roselawn. Both men testified that Plaintiff had not left his father's property for quite some time before the Defendants arrived on the scene.  Their testimony, however, is in direct contradiction to Plaintiff's Complaint, which clearly states that around this time, Plaintiff "was lawfully standing on *Roselawn street*."  (Compl. ¶ 5) (emphasis added).

Given Defendant McAllister's testimony that he saw Plaintiff walking away from the site of where Defendant McQuarrie told him that a hand-to-hand drug transaction and Plaintiff's own admission in his Complaint that he was standing on the street around the time the incident in question occurred,[1] Defendant McAllister had reasonable suspicion to initially stop Plaintiff.

As to whether Defendants possessed probable cause to arrest Plaintiff, it is undisputed that after he observed three individuals walking away from a suspected hand-to-hand drug transaction, Detective McAllister exited his vehicle, walked toward Plaintiff, and told him two or three times to "come here."  It is also undisputed that after Plaintiff realized Detective McAllister was a police

---

[1] The emergency room report from St. Joseph Mercy Oakland states that when Detective McAllister approached Plaintiff, Plaintiff was standing "outside on the lawn."  (Defs.' Br. Ex. D).

officer, Plaintiff yelled and screamed at Detective McAllister to let him go and that at one point, Plaintiff's father had to tell Plaintiff to calm down. (Pl.'s Dep. 88-90). Based on Plaintiff's admissions alone, Defendants had probable cause to arrest Plaintiff for obstructing or otherwise hindering a police investigation by knowingly refusing to comply with a lawful command in violation of Mich. Comp. Laws § 750.479.

Even accepting Plaintiff's testimony as true, no genuine fact issue remains as to whether Defendants had reasonable suspicion to initially stop Plaintiff and then probable cause to arrest him. Indeed, at the hearing, Plaintiff's counsel did not object to the Court framing the case as solely involving the issue of excessive force; the Court did not foreclose Plaintiff's counsel from addressing any other issues; and the sole issue argued by defense counsel was excessive force.

Accordingly, the Court grants Defendants summary judgment on Plaintiff's false arrest and false imprisonment claim.

### 2.     Excessive Force

In determining whether Plaintiff presented sufficient evidence to establish genuine issues of material fact that the individual Detectives violated Plaintiff's right to be free from excessive force, the court has to first ascertain the source of that right. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."). In cases where, as here, "the plaintiff was a free citizen at the time of the incident and the use of force occurred in the course of an arrest," the Fourth Amendment's reasonableness requirement provides the standard upon which to analyze the excessive force claim. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2006).

Plaintiff's excessive force claim is based on his allegation that on the way to the City of

Pontiac police station, Defendant McAllister stopped the police vehicle, turned around from the driver's seat, and punched Plaintiff in the face four or five times under his right eye, thereby causing Plaintiff to suffer a large contusion on his right cheekbone.

Defendants contend that not only is Plaintiff's claim physically implausible but also that it is doomed by contradictions and inconsistencies within the record. Specifically, Defendants point to Plaintiff's testimony that Detective McAllister pushed him onto the hood of the car backwards so that his back landed flat against the hood. (Pl.'s Dep. 96-97). This testimony, they argue, is contradictory to Defendants' and Edward German's testimony, as well as Plaintiff's Complaint and the emergency room report from St. Joseph Merch Oakland, which all provide that Plaintiff's head made contact with the hood of the police vehicle at some point during Plaintiff's arrest. Defendants also argue that there is a discrepancy between the Complaint and his testimony because the Complaint does not mention Detective McAllister punching Plaintiff in the face. Defendants claim that these glaring inconsistencies combined with the physical limitations of Detective McAllister sitting in the driver's seat of the police vehicle render Plaintiff's testimony that Detective McAllister punched him in the face so inherently illogical and physically implausible that it is insufficient as a matter of law to create a material issue of fact. *See Scott v. Harris*, 550 U.S. 373 (2007).

In *Scott*, the U.S. Supreme Court expressly held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary." *Id*. at 380. *Scott*, though, involved the introduction of an undisputed video of the events in question. The Court found that the videotape so utterly discredited the plaintiff's versions of the events that no reasonable jury could have believed him.

In the case at bar, Plaintiff's testimony may be cast into serious doubt by the record, but it

12

is not "blatantly contradicted" by it, as was the case in *Scott*.  First, although Plaintiff may not have mentioned during his deposition that his face was slammed into the hood, he was never asked whether his face made contact with the hood.   Further, his father testified that although Plaintiff was initially pushed backward so that his back made contact with the hood, Detective McAllister flipped Plaintiff over and slammed his face into the hood.  Second, to the extent that there is an inconsistency between the Complaint—by not specifically referencing Detective McAllister punching Plaintiff—and Plaintiff's testimony, any such discrepancy is of little weight as the emergency room report clearly indicates that one of the police officers turned around and punched Plaintiff in the face.  (*See* Defs.' Br. Ex. D, St. Joseph Mercy Oakland Emergency Record).  Hence, Plaintiff's depiction of the events in question did not change from the time the Complaint was filed and the time he was deposed.  The omission of an important factual allegation in his Complaint may have been careless, but it does not defeat Plaintiff's excessive force claim.

Accordingly, the Court finds that there is a genuine issue of material fact as to whether Detective McAllister violated Plaintiff's Fourth Amendment right to be free from excessive force because his alleged actions of punching Plaintiff in the face four or five times while Plaintiff was handcuffed in the backseat of the police vehicle was not reasonable under the circumstances.

As to Detective McQuarrie, the Court also finds that genuine issues of material persist as to whether Detective McQuarrie violated Plaintiff's right to be free from excessive force.  Under certain circumstances, police officers can held liable for failing to protect a person from the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (*citing Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982)).  Such liability may be assessed when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent

13

2:08-cv-10834-PDB-RSW Doc # 29 Filed 08/21/09 Pg 14 of 15 Pg ID 374

the harm from occurring." *Id.* (*citing Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Plaintiff claims that Detective McQuarrie had a duty to protect Plaintiff by stopping Detective McAllister from punching him in the face, that he asked Detective McQuarrie to intervene and stop the attack, and that in spite of this duty and Plaintiff's request, Detective McQuarrie did nothing to prevent the attack. Defendants argue that Plaintiff's testimony is insufficient as a matter of law to create a cause of action against Detective McQuarrie. Defendants highlight that the alleged attack occurred in a matter of seconds and that not only would Plaintiff not have an opportunity to ask Detective McQuarrie to intervene but also that Detective McQuarrie would not have the opportunity to intervene even if Plaintiff had asked him to do so.

While Plaintiff's claim against Detective McQuarrie certainly is weakened by his testimony that the alleged attack occurred in a matter of seconds, the Court finds that there is at least a genuine fact issue as to whether Detective McQuarrie observed excessive force being used by Detective McAllister and whether he had the opportunity and means to prevent Detective McAllister from further punching Plaintiff.

### 3. Conspiracy Allegations

In Plaintiff's response brief, he concedes that there is no issue as to his conspiracy allegations and agreed to a dismissal of those allegations. Therefore, the Court grants Defendants summary judgment to the extent that Plaintiff's conspiracy allegations in his Complaint formed a basis for relief.

### III. CONCLUSION

For all these reasons, the Court:

**(1)** **GRANTS** Detective McAllister and Detective McQuarrie summary judgment as to Plaintiff's false imprisonment and false arrest claims;

14

**(2)**      **DENIES** Defendants summary judgment as to Plaintiff's excessive force claims;

and

**(3)**      **GRANTS** Defendants summary judgment as to Plaintiff's conspiracy claims.

**SO ORDERED.**


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 21, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 21, 2009.


S/Denise Goodine
Case Manager